```
1              BEFORE THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,        .
                                     .  Case Number 21-cr-74
4            Plaintiff,              .
                                     .
5        vs.                         .
                                     .  Washington, D.C.
6   JOSIAH COLT,                     .  May 10, 2023
                                     .  1:15 p.m.
7            Defendant.              .
    - - - - - - - - - - - - - - - - -
8

9             PUBLIC TRANSCRIPT OF SENTENCING HEARING
                    (SEALED PORTION REDACTED)
10          BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                  UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13  For the United States:       JESSICA ARCO, ESQ.
                                 United States Department of Justice
14                               950 Pennsylvania Avenue Northwest
                                 Washington, D.C. 20530
15

16  For the Defendant:           MARK ACKLEY, AFPD
                                 Federal Public Defender's Office
17                               702 West Idaho Street
                                 Suite 1000
18                               Boise, Idaho 83702

19

20

21  Official Court Reporter:     SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25  Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.
```

```
1                        P R O C E E D I N G S
2           (Call to order of the court.)
3                COURTROOM DEPUTY:  Your Honor, we are in Criminal
4    Action 21-74, the United States of America versus Josiah Colt.
5           If I can have counsel approach the podium and state your
6    names for the record, starting with the United States.
7                MS. ARCO:  Good afternoon, Your Honor.  Jessica Arco,
8    on behalf of the United States.
9                THE COURT:  Good afternoon, Ms. Arco.  Did you get
10   some food?
11               MS. ARCO:  I did.  Thank you.
12               THE COURT:  All right.  Good.
13               MR. ACKLEY:  Good afternoon, Your Honor.
14      My paralegal told me that my voice would sound very
15   distinct, and I guess I've had a cold.  So I apologize for that.
16      Mark Ackley for Josiah Colt.  And yes, I had a banana.
17               THE COURT:  I'm sorry I'm a little late.  We just went
18   over, and you probably heard, the sentencing of Mr. DeGrave.
19      Good afternoon, Mr. Ackley, nice to have you here,
20   Mr. Colt.
21      Are we prepared to go forward with sentencing?
22               MR. ACKLEY:  Yes, Your Honor.
23               MS. ARCO:  Yes, Your Honor.
24               THE COURT:  For the record, I've reviewed the final
25   presentence report and recommendation.  I've also read the
```

1    parties' sentencing memoranda, as well as the defendant's reply

2    to the government's memoranda.  I read all the letters, the many

3    letters submitted on behalf of Mr. Colt.  I've also reviewed the

4    visit -- the exhibits multiple times, the various videos and the

5    victim statements.

6         I'm trying to think if there's anything else that I should

7    have mentioned on the record.

8         Did I cover everything, Mr. Ackley, from the defense side?

9              MR. ACKLEY:  Yes, Your Honor.

10             THE COURT:  Ms. Arco?

11             MS. ARCO:  Did you mention the motion for departure?

12             THE COURT:  That was it.  All right.  There's a motion

13   for downward departure from the government.  I can't recall

14   whether there was a response to that.

15             MR. ACKLEY:  No.  We agree with the motion, Your

16   Honor.

17             THE COURT:  You don't oppose that?

18             MR. ACKLEY:  We do not oppose it.

19             THE COURT:  Okay.  So Mr. Ackley, have you reviewed

20   the presentence report with Mr. Colt?

21             MR. ACKLEY:  I have, Your Honor.

22             THE COURT:  Are there any remaining factual

23   inaccuracies or objections to the report?

24             MR. ACKLEY:  No, Your Honor.

25             THE COURT:  All right.  Mr. Colt, have you had

1    adequate time to read the presentence report in full?

2              THE DEFENDANT:  I have read it, yes, Your Honor.

3              THE COURT:  And you've discussed it with your

4    attorney?

5              THE DEFENDANT:  I have, yes.

6              THE COURT:  And do you have any corrections to make to

7    the report that haven't been dealt with already?

8              THE DEFENDANT:  No.  We've reviewed it, and it's

9    accurate, Your Honor.

10             THE COURT:  All right.  Thank you.

11        Have you also had a chance to review the sentencing

12   memoranda that have been filed by the government in this case?

13             THE DEFENDANT:  Yes.  I've reviewed the prosecution's

14   and the defendant's, all of it.  Yeah, Your Honor.

15             THE COURT:  All right.  Ms. Arco, any objections or

16   factual inaccuracies for the government?

17             MS. ARCO:  No, Your Honor.  Our only objection has

18   been resolved in the final PSR.

19             THE COURT:  And remind me what that was.

20             MS. ARCO:  That was related to the restitution amount.

21   Because Mr. Colt pled very early on, it was a $1,000 amount as

22   opposed to what the government has been seeking now, $2,000.

23             THE COURT:  I see.  Okay.

24        And, Mr. Ackley, all of these objections are more like, I

25   guess, clarifications, that you understand the Probation

1    Office's response and you don't continue to object to these?

2              MR. ACKLEY:  That's correct, Your Honor.

3              THE COURT:  All right.  Based on the parties'

4    representations, I will accept the presentence report as my

5    findings of fact pursuant to Rule 32 of the Federal Rules of

6    Criminal Procedure.

7         Ms. Arco, would you like to allocute?

8         Let me go ahead and address the guidelines as well here.

9    They are reflected on pages 10 through 13.  The base offense

10   level under 2J1.2 is 14.  There are a number of specific offense

11   characteristics that apply, including the planning enhancement,

12   but not the obstruction enhancement as existed in Sandlin and

13   DeGrave.  And there's also a downward adjustment for acceptance

14   of responsibility.

15        So the parties agree that the total offense level is 24 and

16   that the guideline range before any departure is 51 to 63

17   months?  Mr. Ackley?

18              MR. ACKLEY:  Yes, Your Honor.

19              THE COURT:  Ms. Arco?

20              MS. ARCO:  Yes.

21              THE COURT:  The Court has independently calculated the

22   guidelines and agrees with the PSR.

23        All right.  With that, I will turn to Ms. Arco to allocute

24   on behalf of the United States.

25              MS. ARCO:  Thank you, Your Honor.

1          First, as a matter of procedure, the government referred to

2     eight video exhibits in its sentencing memorandum, which the

3     government provided to the Court via a file-sharing platform,

4     USAfx.  We would like to formally ask those be introduced into

5     evidence, and I understand there's no objection.

6               MR. ACKLEY:  No --

7               THE COURT:  Those will be admitted.

8               MS. ARCO:  Thank you.

9     Your Honor, I won't repeat the entirety of the government's

10    sentencing memo during my allocution today, but I did want to

11    highlight a few points, particularly through the use of video

12    exhibits.

13         Now, I know that you have reviewed them, but I do think

14    it's important in particular for members of the public present

15    in the courtroom today to see the video exhibits.  I understand

16    that some members of Mr. Colt's family are here.  And I believe

17    it may inform and ultimately assist in the defendant's

18    rehabilitation, as well as their healing process.

19         Your Honor, the attack on the United States Capitol on

20    January 6, as you know, was unprecedented and defies comparison.

21    It wasn't just an attack on the people who work there or the law

22    enforcement officers sworn to protect them.  It was a threat to

23    our entire democratic process, to the peaceful transition of

24    power that is emblematic of our country as a bastion for the

25    rule of law around the world.

1     The government's sentencing memorandum explains in detail

2   why the sentencing guidelines and the 3553(a) factors, in

3   addition with Mr. Colt's cooperation taken into account, why

4   those warrant the government's recommended sentence.  And I

5   won't repeat all of that discussion.

6     What I would like to do is share some additional commentary

7   and videos depicting the defendant that day to illustrate his

8   actions and show why our recommended sentence of 18 months'

9   incarceration is more than appropriate.

10    To briefly summarize, Your Honor, Mr. Colt came to D.C. on

11  January 6 expecting violence rising to the level of a civil war.

12  Rather than stay home with that expectation, he and his

13  co-conspirators armed themselves, transporting weapons,

14  including Mr. Colt's Glock pistol, across the country, prepared

15  for and amping each other up to engage in the expected violence.

16    Once in D.C. on the 6th, Mr. Colt didn't walk around

17  checking on little old ladies in need of help, as some of his

18  character letters seem to suggest.  He took advantage of the

19  violence of the mob, including that of his two co-conspirators,

20  to seek out and breach the Senate Chamber, where he believed his

21  elected officials were meeting to disrupt the proceedings and

22  effectively stop the steal.

23    He was the very first rioter to breach the Senate Floor

24  itself, and he opened doors so that other rioters could as well.

25    As I've noted in his co-conspirator sentencing hearings,

1    among what makes this case so disturbing is Mr. Colt was

2    discussing with Mr. Sandlin and Mr. DeGrave, hours before anyone

3    actually breached the Capitol, a plan to storm the Capitol.

4        In other words, Mr. Colt didn't just follow the crowd

5    caught up in the mob mentality.  Rather, he marched from The

6    Ellipse to the Capitol, as Mr. Sandlin repeatedly invoked the

7    plan to, quote, take the Capitol.  And then they jointly

8    executed that plan.  This fact alone sets Mr. Colt worlds apart

9    from most January 6 defendants.

10        What also sets him apart is his decision to jump down to

11    the Senate Floor with the papers on the senators' desks clearly

12    visible and with the knowledge, the explicit knowledge that they

13    had been convened there for a purpose as important as the

14    certification of the presidential election only moments before,

15    moments before they were evacuated due to the advancing mob.

16        This act of his jumping down to the floor emboldened his

17    fellow rioters on the balcony to similarly breach the Senate

18    Floor once Mr. Colt opened the doors for them and wreak havoc

19    therein.

20        I'm only going to show two clips of the eight I submitted

21    in advance.  I know Your Honor has reviewed them.  But I believe

22    they illustrate the mayhem perpetrated by Mr. Colt and his

23    fellow rioters that day.

24        The first clip I will show is from Exhibit 6, which is

25    Mr. Colt's GoPro footage documenting their approach to an

initial breach of the Capitol building.  You will see how he
amped up the crowd around him, directing them to, quote, get in
the building or get out of the way.

I will play it from the beginning.

(Video played.)

MS. ARCO:  Stopping at the 1:12 mark, and I will skip
to the 3:20 mark.

(Video played.)

MS. ARCO:  I wanted to point out the look on
Mr. Colt's face that we just witnessed.  He's seeing rioters
climbing the scaffolding set up for the presidential
inauguration, a mass assault on the building.  He's clearly in
awe in realizing the magnitude of what's going on.

This is the point, in case it wasn't already clear by the
breached barricades, et cetera, that he should have turned back.
Of course, he didn't.

Continuing on.

(Video played.)

MS. ARCO:  Stopping at the 4:20 mark.  I'm going to
skip to the 5:10 mark.

(Video played.)

MS. ARCO:  Stopping at the 5:29 mark.

One, I wanted to highlight his comments, "F the GOP,"
clearly expressing his ire at the GOP.  Also, perhaps this is
obvious, but lions aren't exactly known for being peaceful, and

1    in the government's view, comments like these allude to the

2    violence that Mr. Colt expected if Congress did not come around

3    to his take on the election.

4         Skipping to the 6:15 mark.

5         (Video played.)

6         MS. ARCO:  Stopping at the 6:30 mark.

7         Again, his intentions are clear.  His goal was to interrupt

8    the certification of the Electoral College vote by storming the

9    Capitol and getting to, quote, the main room, the Senate room.

10        THE COURT:  Was this the west side?

11        MS. ARCO:  Yes, Your Honor.

12        THE COURT:  Northwest?

13        MS. ARCO:  Yes.  So he just traversed the West Plaza.

14        (Video played.)

15        MS. ARCO:  Stopping at the 8:00 mark.

16        As you just witnessed, he drew upon his gear that he

17   amassed with his co-conspirators, bringing them across the

18   country to confront the tear gas that he was warned about as he

19   went up those steps before he stormed the Capitol.

20        Skipping to the 8:40 mark.

21        (Video played.)

22        MS. ARCO:  Stopping at the 8:55 mark.

23        No mistaking the obvious blaring security alarm as he

24   initially breached the building.

25        I will now play Exhibit 7, another set of footage from

1   Mr. Colt's GoPro, which depicts Mr. Colt's co-conspirators'

2   assaults, multiple assaults on law enforcement officers.

3       The first assault begins at the 1:35 mark, as Mr. Colt

4   cheers them on.

5       (Video played.)

6       MS. ARCO:  Stopping at the 2:30 mark.

7       As we just witnessed, Mr. Colt recorded the rioters'

8   Sparta-like push against the three Capitol Police officers,

9   which led to another external door breach.  You can hear him

10  screaming in the background, "Yeah, yeah, yeah," and then, "Let

11  them in."

12      You also see where one of those police officers extricated

13  himself after getting pepper sprayed in the eyes, momentarily

14  blinding him and trying to feel along the wall to get to safety.

15      Mr. Colt eventually regrouped with Mr. Sandlin and

16  Mr. DeGrave and led them up the stairs in search of the Senate.

17      I'm going to play from the 3:35 mark.

18      (Video played.)

19      MS. ARCO:  Stopping at the 4:05 mark.

20      Again, the intent is pretty clear.  They are in search of

21  the Senate, where he believes that they're convened for the

22  certification of the election.

23      Skipping to the 5:05 mark.

24      (Video played.)

25      MS. ARCO:  Stopping at the 5:45 mark.

1    Mr. Colt again witnessed his co-conspirators assault

2    Capitol police officers to get closer to the Senate and make

3    entry.  He took advantage of these assaults and maneuvered

4    around them to get in the Senate Chamber, where he was

5    apparently surprised and perhaps disappointed to see that the

6    senators had already been evacuated.

7    Then, despite clearly witnessing his friend's assaults and

8    hearing Mr. DeGrave brag about it, as you witnessed in the last

9    proceedings, Mr. Colt decided that wasn't enough.  He decided to

10   take it to the next level literally and breach the Senate Floor

11   to make a speech.

12   Skipping to the 9:00 mark.

13   (Video played.)

14   MS. ARCO:  And I've played that through the end.

15   Of course, we just witnessed what led to the viral

16   photograph of Mr. Colt dangling from the balcony in the Senate

17   Chamber, as well as him running to the side doors of the Senate

18   Floor to open them for his fellow rioters.

19   THE COURT:  Mr. Arco, Mr. DeGrave had yelled down for

20   him to take laptops and other items.

21   Did he do so?

22   MS. ARCO:  Your Honor, I did want to make that

23   clarification.  I don't believe or I'm not sure that Mr. Colt

24   was still on the Senate Floor by the time Mr. DeGrave made those

25   comments.  Certainly, other rioters were on the Senate Floor,

because Mr. Colt went through those doors, came back in, and then finally exited. And so at the time Mr. DeGrave made that comment, I'm not sure Mr. Colt was still on the floor.

THE COURT: I see. But he didn't take property, damage property?

MS. ARCO: No, we have no evidence of that.

We believe the gravity of the offense speaks for itself and justifies the government's recommended sentence, even accounting for Mr. Colt's significant substantial assistance.

Moreover, the concerns we raised under seal support a sentence motivated by specific deterrence as well.

Of course, as in all of these cases but especially in Mr. Colt's case, his sentence should reflect the concept of general deterrence so that the travesty of what transpired on January 6 never happens again. And doing so would not be unfair, Your Honor, as Mr. Colt himself sought out that spotlight by jumping down and being the first to breach the Senate Floor so he can make a speech. And he was clearly aware of the photo journalist who took that picture of him was next to him and basically waiting on him to jump, asking him if he was going to jump.

Your Honor, I'm happy to address any questions the Court may have, but I believe our filings and the exhibits amply show why the government's requested sentence of 18 months, the agreed-to $1,000 in restitution, and three years of supervised

release is supported by the 3553(a) factors and is sufficient but not greater than necessary to achieve the goals of sentencing.

THE COURT:  And the government's not recommending a fine in light of his financial circumstances; correct?

MS. ARCO:  That's correct.  Thank you.

THE COURT:  Thank you, Ms. Arco.

All right.  Mr. Ackley?

MR. ACKLEY:  May it please the Court.

Last night, when I was sitting in my hotel room, I went to the news and saw that former President Trump was convicted in some sort of civil trial, sexual abuse case or something to that extent.  And I just wondered, like, how the country's going to take it.  And then I started wondering how half of the country is going to take it and how the other half of the country is going to take it.

Then this morning as I was leaving the hotel to come to this courthouse, a big screen was on, and it was CNN, and the headline was millions of dollars funneled from China to Biden. And I had a very similar thought.  How is the country going to take it?  How is half of the country going to take it, how is the other half of the country going to take it?

Suffice to say, in this country, it seems we are more divided than ever.  It seems that the voices of moderation, reason, and neutrality are but whispers, drowned out by the

shouts of extremism, ignorance, and hyperpartisanship.

On January 6, Josiah Colt added his voice to the shouts, the shouts of extremism, ignorance, and hyperpartisanship. He played a role in endangering lives. He played a role in endangering democracy itself. And for that, he is deeply ashamed.

As his sister said in one of the numerous letters in support written on his behalf, he seemed to be a caricature of himself. I think it's a reference in part to Josiah's artistic abilities. But I started looking up quotes because I like looking up quotes. I don't really read philosophy as much as quotes from philosophers.

And one philosopher said that every uneducated person is a caricature of himself. And I think that that's kind of a part of what happened here. I know Josiah quite well. I've gotten to know him. He comes to my office all the time. In my district, it's not uncommon for us to call our clients by the first name, but if that offends the Court --

THE COURT: No, not at all.

So you're from Utah?

MR. ACKLEY: Idaho. Josiah and his family are from Utah initially.

An ignorant person is an uneducated person, and that, I think, fairly characterizes Josiah on that day. And I do think that seeing him hang from the balcony there and even charging

towards the door, I almost picture a caricature in my mind. He is a free spirit. He is a thrill seeker. And I think that that captures that element of his personality, but it doesn't capture everything about him.

And over the past 30 months, but perhaps today more than ever, Josiah can now shed that caricature and lend his voice to the whispers of reason, lend his voice to the whispers of moderation and of peace. And he can do this without sacrificing his principles, his conservative values, or even his beliefs about the 2020 election.

So let it be clear to the Court and to anyone who might be listening today, what Josiah said on January 7, the day after the insurrection, the day after that infamous photograph, what he said that day remains true, and perhaps even more true today, and I will just quote Josiah.

And I should also say that this was January 7th. After January 6, they made their way, the three of them, back to their respective homes. So it took a couple of days. He did not have a lawyer. These were his words.

"I sincerely apologize to the American people. I recognize my actions that have brought shame upon myself, my family, my friends, and my beautiful country. In the moment, I thought I was doing the right thing. I realize now that my actions were inappropriate, and I beg for forgiveness from America and my home state of Idaho."

My remarks today, Your Honor, will be divided primarily into two parts:  First, kind of a summary of Josiah's conduct, what he did, what he did not do on January 6, as well as the events leading up to that riot, and second, a summary of what he has done and what he has refrained from doing since he's been released.

He voluntarily turned himself in, as you know, I think about a week after, which is within a day or two of getting back to Idaho.  And it was kind of a book-and-release situation.  So he's been out of custody this entire time.

So first, the lead-up and the culmination of events on January 6.  Josiah was raised to be a person of faith, loyal to his principles and to his country.  By my calculations, he was 14 when 9/11 happened.  I often think about that as kind of like a big bang event, where everything kind of comes together, the country is very unified, and then things happened.

Without commenting politically, you have Abu Ghraib, you have the Patriot Act, you have Edward Snowden, and you eventually get to ObamaCare.  It's like tight, tight, and then everything explodes.  It seems like we've been divided in many ways since then.  So Josiah for much of his adult life has known that division.

Fast forward to the Trump administration.  I'm not a Trump supporter, but he did do some really good things.  The FIRST STEP Act, to name just one of many positive criminal justice

reforms that he's made.  So I can see why people would support him.

But during that administration, the fact is, our democratic institutions, which already had begun to erode, further eroded. The press, known as the fourth branch or pillar of our government, became fake news, the lamestream media, and even the enemy of the state.

The judiciary, known for its neutrality, became known as biased against the administration, especially on matters of immigration.  And our law enforcement, especially leadership in the FBI, became corrupt.  That was the narrative.

Democrats were communists and Biden in particular a pawn of China.  BLM rights activists became terrorists, and even some Republicans became Republicans in name only.  By the end of it, neither the vice president nor the attorney general could be trusted to do the right thing.

Josiah made his mistake by putting his faith in a single man and giving up on our institutions.  That mistake was reaffirmed by the echo chamber he found himself in on the Internet.  By the time of the 2020 election, Josiah was prime for conspiracy theories and misinformation.

A good lie is built on a kernel of truth and plays on people's fears.  Former President Trump knew this, and he and his surrogates came up with the big lie, and Josiah ate it up. He responded to Ronny Sandlin's recruitment and fellow patriots

1    to support Trump in the January 6 rally.

2        He became a part of a trio.  And I use that loosely,

3    because there were three of them.  They did everything together.

4    But as I will note, they can be distinguished, and they should

5    be distinguished.

6        He became a part of a trio, though, with Sandlin and Nathan

7    DeGrave, which in turn joined the masses and became a part of a

8    mob.  He prepared for the January 6 rally with a promise by

9    Trump that it would be wild.  That rally became known as the

10    "stop the steal rally."

11        How do you stop a steal?  We concede, you stop a steal by

12    stopping the certification.  Accordingly, all preparations for

13    the rally were in a real sense preparations to impede,

14    interfere, and obstruct the certification.

15        Josiah and his group were prepared for violence from

16    counterprotestors, but they also prepared to be ready for a call

17    to action by the president, a call to action that they knew and

18    at a minimum could reasonably foresee could become violent.

19        So Josiah purchased protective gear, helmet, bear spray,

20    walkie-talkies.  He brought a knife, and he brought his pistol.

21    So he was prepared on January 6 to heed the call to action, and

22    when it came, he marched on the Capitol to stop the steal.

23        Now, I want to just pause and step aside briefly, because I

24    did see an earlier sentencing, and I agree that having mixed

25    motives about the preparations isn't mitigating, but I think

understanding the motives is somewhat explaining of what they
did.

So Josiah brought his gun out, and they arrived, I think,
on January 4th, and then he went to a rally on January 5.  He
experienced a rally that was not violent.  He experienced a
rally on that day that did not have the counterprotestors.  And
so he filmed himself that night, the debate about whether to
take the gun.  He did not take his gun.

And so in terms of the mixed motives, I think it's fair,
given that incident, that one of the reasons he geared up as
much as he did is because he thought there was going to be
violent counterprotests.  And one of the reasons likewise that
he left his gun at his hotel before January 6 is because he
didn't think there was going to be the violent counterprotests,
based on what he experienced the day before.

So it may not have mitigation value that moves the needle
that much, but it does kind of show a little bit what was going
on in his head.

He was not, you know -- if you thought there was going to
be a gun fight, you don't bring a knife to something like that.
And so he left his gun behind.

So we've seen the videos.  On his way there, Josiah added
that loud voice, the shouts that I mentioned earlier, calling
for a breach of the Capitol.  He did yell, "Push, push."  He
profanely disparaged Republicans, decried Republicans, just as

President Trump had done, as pathetic weaklings.  He proclaimed the Capitol "the people's house, our house."

To be clear, Josiah is not affiliated with and does not endorse groups like Proud Boys and Oath Keepers.  One of the portions of the video, Josiah is proudly proclaiming that we're just looking around at everyone, we're just ordinary people, we're not extremists, we're patriots.  But he's not a part of any kind of militia or extremist group.

All of this he did while ignoring signs of a violent breach, like the government noted:  Broken barriers, glass, the alarm that you hear.

As he entered the building, he joined the chants of "USA." Once inside, he directed people up the stairs to the Senate Chamber.  He stood by as others, including Sandlin, assaulted a Capitol officer, and then he entered that chamber and jumped to the Senate Floor, captured by that infamous photo.

He sat in the vice president's chair, opened the door.  And within moments really, because as I think the government acknowledges, by the time Mr. DeGrave said "steal the laptops" or something to that extent, Josiah had already exited.

The way he described it in one of the proffer sessions that we had with the government is that he got down there, and he's kind of like -- he sits in the chair, and then he comes back out, and some of the adrenaline starts running off and some of the gravity of the situation starts kicking in, and he didn't

1    really know what else to do, and he didn't really like the vibe

2    that had clearly just developed.  And so he exited.  He didn't

3    take anything.  He didn't rifle through papers.  He didn't take

4    any photographs, none of that.

5              THE COURT:  Did he go outside at that point?

6              MR. ACKLEY:  Yeah, he did.  He went out the hallway.

7    Eventually, Mr. DeGrave catches up to him, who has Josiah's

8    GoPro.

9         And I should mention that also, so much of this is from

10   Josiah's GoPro, and I guess it's not mitigating, it's just not

11   aggravating, I suppose, that he did not destroy anything.  He

12   provided that GoPro to the government as a part of his

13   cooperation.  Even before he decided to cooperate, he could have

14   deleted all that, and he did not.

15        When the adrenaline wore off and fear set in, he made his

16   way out and back to Idaho.

17        I already think I mentioned some of the things he did not

18   do, such as he did not take the pistol.  He did not take a knife

19   out of his backpack.  He never wielded it.  He did say "push,

20   push," but he never actually engaged in the pushing itself.  He

21   did not engage physically with any of the officers.  He stood

22   by.  Some of it was captured on his GoPro video, which I don't

23   think he actually saw the extent of what was really happening

24   just because the video picked it up.  But he certainly was not

25   as -- I think the Court used the word "fully engaged," as some

1    of his co-conspirators were.

2         THE COURT:  He was certainly fully engaged in amping

3    up the crowd and encouraging the crowd.

4         MR. ACKLEY:  For sure, absolutely, absolutely.  Part

5    of that is -- we're not relying on that sort of mob mentality

6    defense, but there is a certain amount of that.  The adrenaline

7    is rushing, and he's not the only one who is saying these

8    things.  But yes, he was certainly a part of that loud voice

9    that became a mob.

10        Another distinction from his co-conspirators that I think

11   was mentioned by another court at a detention hearing for, I

12   think, Mr. Sandlin, he never engaged in any kind of vandalism.

13   And it's not on the video clips that the government played, but

14   there are different times where he said, you know, "Respect this

15   house, it's a sacred place."

16        And then moments before he left that Senate Chamber to the

17   floor, another defendant, his last name is C-u-a, I forget how

18   to pronounce it, but he's a young kid, and he jumps down, and he

19   takes the vice president's seat and kicks his feet up on the

20   desk.  You can see Josiah -- there's no audio; it's a C-SPAN

21   video.  You can see Josiah come into it and kind of say, Put

22   your feet down.  So it's kind of a weird mix with Josiah.

23        For everything I say about him saying show respect, you

24   could easily come back and say well, yeah, but he didn't exactly

25   like stop them from doing things.  It's one thing to tell

1    someone to take their feet off a desk.  I get it.  It's another

2    thing to say, Hey, you shouldn't be assaulting that officer.

3        Again, I think there's a level that it happened very

4    quickly, and I think especially before they went up, I don't

5    think Josiah saw half the things when he's calling out to Ronny

6    that's actually going on.  Yes, he knew that he wanted the

7    people to come in, and he was encouraging that.  But in terms of

8    that officer who got maced, I don't think that Josiah even saw

9    that.  His attention, if you watch the video, is clearly on

10   trying to get Ronny, and then you see this officer kind of like

11   stumbling to the side.

12        THE COURT:  In many of these cases, there's tension.

13   The tension here is not nearly as extreme as in another case I

14   recently had where the defendant assaulted an officer but at the

15   same time he raised as mitigating the fact that he was telling

16   people not to smoke a marijuana joint in The Rotunda.

17        So there's a disconnect between the reality of what they're

18   doing versus what they're seeing other people do.

19        MR. ACKLEY:  For sure.  It's been something.  It's

20   been a privilege in many ways to represent Josiah, because I

21   don't support any of this, obviously -- I mean, I think

22   obviously.  And so I've pushed back on him on all kinds of

23   things, and I've seen the growth.  And I know I'm not a witness

24   to that, but I am going to address a little bit the remorse that

25   he has, which I think is intense.

1    But it speaks well to Josiah's character that when some guy

2    who was initially a stranger is just pushing back, pushing back

3    on all these things, and he's just very super receptive to it.

4    Going back to his sister's statement, it really seems to be

5    that that's a caricature of him, and that doesn't really

6    represent who he is as a whole person.

7    So what he did.  Now I'm moving on to the past 30 months,

8    and I know Your Honor already knows a lot of these things, but I

9    think it bears repeating, because this -- this is why:  In my

10    opinion, the guidelines take into account pretty much all the

11    aggravating factors in this case.  And the cooperation takes

12    into account the value of his assistance, the timeliness of it.

13    But I don't think that the cooperation, which is ultimately a

14    guideline issue, 5K1.1, should just swallow all the other

15    3553(a) factors as if, okay, this is a departure from the

16    guidelines, and therefore, that's a fair sentence.

17    I think there are aspects of his history and character

18    before January 6 and then, as I'm going to talk about a little

19    bit, you know, for the past 30 months that justify a variance in

20    this case.

21    Now, our recommendation obviously is a pretty significant

22    variance of six months' home incarceration.  But there is room

23    for play between what we're asking for and the 18 months that

24    the government is recommending, which -- I've really gotten to

25    know the prosecutor, and I really respect what they're doing in

all these cases, but I don't think that the 18-month really
reflects a full consideration of the 3553(a) factors.

So, Josiah posted his remorse --

THE COURT:  Some take the view that the guidelines do
incorporate most of the 3553(a) factors.  You're talking about
the history and circumstances of his childhood and that sort of
thing?

MR. ACKLEY:  Yes.  And once you get into Chapter 5, it
says that most of the time you don't consider these things.  I
don't know how that's really promoting 3553(a) factors.

And then I saw one sentencing memo from someone, I think an
attorney for one of the three, where it said, like, "the
guidelines require," and I'm like, the guidelines require?  I
mean, *Booker* was before me, but I grew up in a post-mandatory
system.

Anyway, he posted his remorse.  So he knew that his photo
coming down was going to be viral probably, or he realized that
very quickly.  But a lot of things that he did was very public
after January 6.  He posted his remorse.  He pled guilty early,
one of the earliest.  He cooperated early and often.

THE COURT:  He was the first, was he not?

MR. ACKLEY:  I believe so, but I didn't want to make
that assertion.  But I've got a nodding prosecutor.

THE COURT:  The government already has in *DeGrave*.

MR. ACKLEY:  Okay.  And the cooperation was valuable.

1      And that also became public.  I think I indicated that.  He did

2      not push back on that.  So in some ways, he has also become a

3      poster child of what you're supposed to do after you really

4      screw up.  So I think that's a positive sign for people as well.

5              THE COURT:  Can you address some of the government's

6      remarks?  And I don't know if this was under seal or not, but if

7      it is, I don't think that it's --

8              MS. ARCO:  It was, Your Honor.  I defer to him.

9              THE COURT:  But it's not tied to the specifics of

10     cooperation.

11     Do you object to me asking you a question in the open

12     courtroom about the degree of remorse that he showed later?

13             MR. ACKLEY:  Do I?  No, I do not have an objection.

14             THE COURT:  You know, Ms. Arco has made a point that

15     at a certain point in connection with the debriefings -- and we

16     won't get into the specifics of the debriefings, but at a

17     certain point, she or the agents began to question whether he

18     really did get it, even now.  Certainly, I credit everything

19     you're saying, him coming forward.  That was a difficult

20     decision.  He was the first one in.  There were ramifications of

21     that, both positive and negative.  That's a big step towards

22     showing remorse, and certainly, posting something publicly

23     admitting how wrong it was goes a long way toward showing

24     remorse.

25     But tell me why I shouldn't put too much weight on that

remark that Ms. Arco made in his papers about his wavering

remorse.

MR. ACKLEY:  It was a snapshot, for one.  It was on

December 14th of 2022, during a Zoom video.  So Ms. Arco and her

agents were, you know, remote from us.  And it also came in with

a particular context.  Josiah had cooperated three times in

quick succession, I think in March of that year, maybe earlier,

2021.

So that's a part of this.  A lot of time was passing.  And

during that time --

THE COURT:  Is he drifting back into being manipulated

by things that aren't real?

MR. ACKLEY:  A little bit, a little bit, but that

doesn't affect his remorse.  I think that the government's

comments were directed to the fact that he still harbors

questions about the election as opposed to harboring any kind of

like, you know, questions about what he did on January 6 in

response to that.

Those are two wholly different things.

THE COURT:  Agreed.  But I'm not sure that I read her

statement that way.

MR. ACKLEY:  Well, I've got -- I'm sorry, Your Honor.

I do have a copy of the debrief report, and it doesn't say

anything about his remorse, like questioning his remorse, that

was prepared.

1          THE COURT:  But that wasn't the purpose of the

2    interview.

3          MR. ACKLEY:  Sure, sure.  But again, we're talking

4    about a brief part of December 14th, 2022, the perspective of

5    the government in that context.

6          THE COURT:  I thought the government was saying

7    something like it was patriotic; he was suggesting it was

8    patriotic actions or something along those lines.

9       Am I remembering incorrectly?

10          MR. ACKLEY:  No -- well, not entering the Capitol.  He

11    doesn't think that that was patriotic, that portion of it.  But

12    the right to freely assemble --

13          THE COURT:  Of course.  It's a constitutional right.

14          MR. ACKLEY:  It just comes up in the context of these

15    debriefs, that distinction, and he has shown support for that

16    constitutional right.  And sometimes I think that they

17    misinterpreted it.  I saw what he was saying as well, and I was

18    concerned about that.

19       And so I even stepped in at the end of the debrief, and I

20    said something to this effect:  At the last debrief, Josiah came

21    in in a state of despair.  He had already cooperated

22    extensively, as I indicated.  It had been almost two years of

23    waiting.  And as it turns out, he would have to wait another six

24    months.  He has lost his job and at that time was having

25    difficulties finding another one.  His parents' home had been

1    vandalized, and he was still receiving a steady stream of
2    Internet and other hate mail.
3        And what was initially limited to extreme groups was
4    changing in the country.  Like, Speaker McCarthy on January 6th
5    and/or the 7th -- well, he wasn't speaker at that point, but he
6    condemned the actions.  And his and other people throughout the
7    country, their voices had softened in terms of January 6.
8    That's just a fact.
9        And so yes, polling, the country was dividing over whether
10   that was right or wrong.  And so doubt, I have no question, was
11   beginning to creep in.  But he was at a low point at that point.
12       I hope the Court will question him about that if there's
13   any question about his remorse.
14       Deprogramming is a process, and it's kind of weird to call
15   it deprogramming, because I think he's been brainwashed.  But
16   then again, I think about half the country's been brainwashed.
17   So how do you deprogram that?  I don't know.  I don't think
18   incarceration does it.  I don't think that is successful.
19           THE COURT:  Ms. Arco makes a good point about general
20   deterrence.  When you're involved in a violent breach of the
21   Capitol, there's something more than specific deterrence for
22   someone like Mr. Colt, who I don't think is a violent threat to
23   the country, but there is a message.  He's a very public figure
24   of the January 6 events, and that will be noted, and what he did
25   was outrageous.

1          MR. ACKLEY:  I agree.

2          THE COURT:  Not to mention the purpose of punishment,

3    too.

4          MR. ACKLEY:  I'll address the deterrence first.  And I

5    agree with the Court that in terms of specific deterrence, it

6    doesn't seem like incarceration is really necessary -- you

7    didn't say that.  That's how I understood --

8          THE COURT:  That's fair enough.  To the extent

9    there's -- a prison sentence is appropriate here, it is to

10   provide general deterrence and punishment.

11         MR. ACKLEY:  Very good.  I will answer that, then.

12      In terms of general deterrence, I appreciate that he has

13   somehow, you know -- well, through his own actions become the

14   face of this.  But it's really kind of a distortion in some

15   ways, an unfortunate one.

16         THE COURT:  And I don't mean to suggest because he's

17   the person hanging down and his picture was in papers all over.

18   I mean any rioter who gets to the floor, who is involved with --

19   armed with a knife, has a gas mask on, plans in advance,

20   encourages people to enter the Capitol, all of those things that

21   he did puts him in a category that's very different from someone

22   who gets wrapped up in the moment and walks through and doesn't

23   do anything else.

24      So he's a different class of January 6 defendant that

25   generally is getting longer periods of imprisonment than the

1    government has recommended here.

2            MR. ACKLEY:  I appreciate that, Your Honor.  Two quick

3    points.

4        First, the fact that there have been other sentences that

5    are known to the public does achieve general deterrence.

6    There's a concern potentially about unwarranted disparities or

7    uniformity, but in terms of the general --

8            THE COURT:  Let me add that one.

9            MR. ACKLEY:  I should not have mentioned it.  I know

10   you know it.

11       But in terms of the would-be offender, they know that

12   people have been punished, and in some cases quite severely.

13   They're not going to pick up on what was the sentence in Josiah

14   Colt's case.

15           THE COURT:  Obviously not, but you know my point.

16   It's fairness.

17           MR. ACKLEY:  I do.  The other aspect of it is just

18   addressing general deterrence, and I know punishment is slightly

19   different.  But even the National Institute of Justice, which is

20   kind of like an arm of the Department of Justice, has said that

21   it's the certainty of being caught.

22       And this person, this individual, can be sort of the face

23   for what you're supposed to do.  Like, don't wait to get caught.

24   Yeah, maybe he was going to get caught; right?  But still,

25   immediately, he posts his remorse.

1          THE COURT:  Right.  And he's getting a big benefit

2     from having done that, which puts him in a different category

3     than Mr. Sandlin.

4          MR. ACKLEY:  There it is.  Different category.

5          THE COURT:  Different category, but nonetheless, it's

6     still a serious offense, and the magnitude of the offense can

7     trump the very compelling 3553(a) factors I agree he does have.

8        That's the point.  And where is that line?

9          MR. ACKLEY:  I understand that.

10         THE COURT:  And being commensurate, as you made the

11    point for me, thank you, on the comparisons with -- I would have

12    gotten there, with Mr. Sandlin and Mr. DeGrave.

13       You just listened to the whole sentencing of Mr. DeGrave.

14    They too could argue that he has some pretty mitigating personal

15    factors.

16         MR. ACKLEY:  I do think there's some value in sending

17    different kinds of messages, carrots and sticks, not just

18    sticks, and sending a message to the public that you can make a

19    mistake.  That's something that we recognize in this country,

20    that people get second chances.  But you're not entitled to that

21    second chance.  And there are things that you can do and should

22    do which might very well be rewarded.

23       And I think that, you know, he can -- Josiah can be a face

24    for that as well.  There's going to be reporting of this, I

25    assume, on some level, and I'm hoping that it gets reported, if

1    the Court exercises at least close to the level of leniency that

2    I'm asking for, that it will be reported that this is one of the

3    things that put him in a different category so all the people

4    out there can know that, yes, there have been people severely

5    punished for this, but he is in a different category.

6              THE COURT:  You don't think he's in a different

7    category at 18 months?

8              MR. ACKLEY:  No, because that's based solely on, I

9    think, his cooperation.  But he's done amazing things.  He's

10   been wholly compliant for 30 months.

11             THE COURT:  That's positive; that's very positive.

12             MR. ACKLEY:  He's volunteered his time when he

13   couldn't gain employment.

14        Punishment can come in -- I don't know why I'm looking at

15   you.  I'm sorry.

16        Punishment can come in different forms.  Even the U.S.

17   Supreme Court in the past said, like, probation is punishment.

18   It's a restriction on liberties.  I get it.  Most people in the

19   public are like punishment is incarceration, but punishment can

20   come in different forms.

21        Like in *Padilla v. Kentucky*, they said automatic

22   deportation for life.  That's probably the biggest punishment.

23        So being stigmatized, like I wrote in our sentencing memo,

24   has been a part of the punishment Josiah has experienced.

25   That's the part of the punishment that has kind of changed him,

that we want incarceration to do, but there's other things that
can change an individual.  I think when you look at Josiah's
background, you can see that he would be amenable to that, not
just the past 30 months but the lifetime before January 6.

I really appreciate the Court's questions.  It got me off
my written remarks.  So I'm just going to take a moment to make
sure there's not --

THE COURT:  Take your time.

MR. ACKLEY:  I think you anticipated my remarks,
because everything you asked drew them out.

Unless the Court has any other questions -- oh, I should
also say that his parents are here.

THE COURT:  Thank you for being here.  The letters
were incredible on his behalf.  Thank you all for taking the
time to write them.  It's clear he has a very loving, supportive
family who values him enormously and he's a real giver.  This is
quite out of character.  That came across very clearly.

Let me, while I have you standing there, just pivot to
Ms. Arco and ask -- you can stay where you are.  Speak into the
microphone, please.  But if you can address this issue about the
5K motion.

To what extent, if any, is the government taking into
account the 3553(a) factors?  You know, here, I would say the
most significant -- positive is not the right word to use, but
those factors that may be mitigating in his case are obvious in

terms of some of them are the trauma in his background reflected

at 57, 58, 59, 60, and 66 of the PSR; his actions before this

event; the fact that he has had no violations of supervision;

the fact that he was first in -- I assume that was taken in.

Lack of criminal record, that's taken into account.

To what extent did that, if any, inform the government's

decision to depart downward a significant amount, nine levels,

which is nearly double what Mr. DeGrave got, even though both of

them were cooperating against most of the same individuals?

So I did view that as a real reward to Mr. Colt and the

outside world with if you come in early you're going to get a

bigger departure.  I think that's clearly reflected in the

government's recommendation, but if you could speak to that

earlier point, Ms. Arco.

MS. ARCO:  Yes, Your Honor, and I'm going to be very

careful here, because I don't want to get too much into internal

deliberations.

THE COURT:  Understood.

MS. ARCO:  The departure range we landed on, it's a

range.  So it's nine levels downward from what his guidelines

range otherwise would be.

THE COURT:  And the low end of that range.

MS. ARCO:  Exactly.  As you likely know from your work

in other of these cases, our starting point is the midpoint of

the guideline range.  So the fact that we have allocuted at 18

months the low end of that range I think does take into account

things other than his cooperation, like his nature and

characteristics.  That is more amorphous and less concrete than

just an analysis of what he actually did in terms of substantial

assistance.

THE COURT:  So in effect, you gave, by doing that, a

one-level -- if we're going to be concrete about it, a one-level

adjustment for these more amorphous 3553(a) factors.

MS. ARCO:  Yes, Your Honor.  Again, without getting

into our internal discussions, because we're human and we're

trying to analyze a whole set of facts, not just okay, he did X,

Y, Z to help the government, you know, we talk about the whole

case.  We talk about his conduct.  We talk about, you know, my

and the agent's view of who he is as a person in coming to these

conclusions and deliberations.

Yes, it's based on his substantial assistance, but it's a

broad conversation when we are having these conversations.

THE COURT:  Understood.  Thank you.

Do you want to respond to that at all, Mr. Ackley?

MR. ACKLEY:  Well, just to say that it's greater than

Mr. DeGrave's, no doubt, because his cooperation is more

valuable.  In fact, I don't think -- it seemed to suggest that

Mr. DeGrave pled guilty, in part, because of Josiah's

cooperation and then, thus, continued to cooperate.  So I think

there's that.

1    Also, I'm not sure -- I guess it's very amorphous.  In my

2    district, we always get guideline recs from the government.

3    It's as if the guidelines are still mandatory.  I guess you can

4    play within that guideline range, but that's pre-*Booker*.

5    5Ks are technically not to supposed to take into account

6    all of those other things.  They're supposed to be based on the

7    value of assistance, the threats someone might be facing for

8    coming forward, which also is often disregarded, at least in my

9    district, in terms of the 5K motions.  It doesn't seem to be

10   fully appreciated how much someone is putting their neck out

11   there, and especially in a case like this where it wasn't filed

12   under seal and it became known very quickly.

13   And we didn't push back on that, as I said in our

14   sentencing memo, because that's a part of what Josiah wants to

15   present to others, is that you do cooperate when you goof up,

16   you do express remorse and you try to make amends, and that's

17   the best that he could do.

18   I also note in our sentencing memo, a lot of the positive

19   things about Josiah's history and characteristics just by their

20   nature weren't fully captured by the presentence report.  That

21   was a telephone interview from across the country.

22   So I understand the government says they considered his

23   history and characteristics, but they really couldn't

24   meaningfully do that.

25   And so I don't believe that a three-month reduction from

the middle of that range really adequately takes into account

his full history and characteristics.

Thank you, Your Honor.

THE COURT:  Is there anything you want to say under

seal with regard to the cooperation, or do you think it's

captured in the papers?

MR. ACKLEY:  I believe it's captured, yes.

THE COURT:  Ms. Arco?

MS. ARCO:  Your Honor, if possible, I would like to

briefly say something under seal that relates to his

cooperation.

THE COURT:  Okay.  We will briefly close the

courtroom.  Apologies.

(The following occurred under seal.)

























18    (End of sealed proceedings.)

19        THE COURT:  All right.  I will wait for Mr. Hopkins.

20        All right.  Mr. Ackley, is there anything more you would

21    like to say?  If not, would Mr. Colt like to make a statement?

22    This is his opportunity to do so.

23        MR. ACKLEY:  I don't have anything further, Your

24    Honor, and Mr. Colt would like to make a statement.

25        THE COURT:  Mr. Colt, if you could come up to the

1     podium, please.

2          THE DEFENDANT:  Your Honor, I appreciate this

3     opportunity to address the Court today.

4          First and foremost, I should have never stepped foot on the

5     Capitol that day.  I really am embarrassed and ashamed.  It's

6     hard to watch back those videos with the time that I've had to

7     reflect on my actions.  I should have turned back, and the

8     adjectives that have been used to describe that day are

9     accurate.  It was tragic.  It was outrageous, my actions.  And

10    it was a travesty that should never happen again.  And I am

11    fully remorseful.

12         I realize there's been some people come before the Court

13    and apologize or show remorse and then afterwards maybe not

14    stick to that, but I've had a lot of time to reflect over the

15    last 30 months on the buildup and, you know, why it happened,

16    why I was involved, the why about everything.

17         So I want to share a few of those whys about why I really

18    am remorseful from an honest, genuine place.

19         First of all, you know, we started seeing the footage that

20    started coming out that next day.  First, the Capitol Police, it

21    was unfair to them.  You have people that have worked there 15

22    years and ushered millions of people throughout the Capitol

23    peacefully, and then to have their lives -- I saw texts and

24    conversations where they were not sure if they were going to

25    come home that day, and a lot of genuine terror and scared

officers that should never have been put in that position.

So when I think about putting myself in their position, it was absolutely unnecessary and uncalled for, and it was awful. And honestly, I respect them. They stood the line of duty, and they had a job to do, protect the senators and representatives, and they did that. And I feel very ashamed, because I do support our police, and I do support our military, that we jeopardized their position, and I feel awful about that.

I also feel -- I saw the texts that came from the senators and representatives, worrying if they were going to get home, like saying good-bye to their family and hiding in closets and being ushered out. I can't imagine the terror of having a mob outside when you're trying to do your job, the democratic process and just moving forward as usual and you have an angry crowd outside stopping that.

I am extremely remorseful that I was not more of a voice of reason to my friends and those around me. I could have at multiple points, at TGI Friday's, driving there, after the rally, after the Trump rally, said, That's good, we did our job, we rallied, we got our point across. And at multiple points, I could have been a voice of reason for them and for those around me instead of yelling "push, push, push" and go in and do these things. I should have not have done it to begin with or been more of a voice of reason for, you know, the unlawful and the violence I did see that day.

1    And there's a lot of people that have had their lives

2    destroyed on both sides because of the tragedy of this day, and

3    I played a role in that, and I feel awful about that.

4    I'm not going to make this a "poor me" session at all, but

5    I have had to forgive myself, you know.  I lost -- I was on an

6    amazing trajectory professionally.  I lost my job, receiving all

7    the death threats, at some points being afraid for my life.

8    People texted me they're going to come to my house and kill me,

9    being ostracized from society, getting wiped off social media,

10   and just feeling like ostracized from society.

11   And that did play a role in my mental health and not

12   feeling good about myself.  But more than anything, I put my

13   family at risk.  My family's house got vandalized, which you

14   saw.  I'm thankful to the Boise Police Department, who protected

15   my house during that time, but this was all because of my

16   actions and me being stupid, and just the collateral damage

17   emotionally in our family and everything that's come along with

18   that has been hard to deal with.

19   And I love my family more than anything, and putting them

20   at risk is -- I feel awful about.  And I know that that -- it

21   wasn't just me that walked in that day that that happened to

22   their families, the emotional and just being scared.

23   Also, just addressing America, there was a democratic

24   process unfolding, and we interrupted it.  Point blank.  We

25   shouldn't have stepped foot on the Capitol that day.  I've been

called a terrorist, an insurrectionist, a seditionist, a
traitor, a fascist, and the list goes on.

But I -- and although I don't agree with those terms about
me, I have had time to reflect, and I get it.  I understand why
I was fired from my job.  I understand why it's hard for me to
get another job.  I understand the hate texts and the e-mails
and the anger and the sadness that I -- because I was more of a
public figure in it, you know, took a lot of that.  I get it.

And I'm actually very empathetic, and I don't resent those
comments anymore, because other people have had a lot of sadness
and anger because of my actions and other people's actions going
in that day.  So it's like when people are mean to me or
harassment or bullying me or my parents, I get it, and I
honestly don't blame them for feeling that way.  It's
justifiable anger, and it's justifiable sadness.

The optics aren't good.  To be honest, those pictures of
me, I look like a terrorist running to the desk.

There was a dark moment where I felt like maybe I should --
maybe I'm not worth having here.  A lot of people told me that I
should kill myself, that I should -- and all the hateful
rhetoric that kind of went along with that, but I started to
believe it, and there was a dark moment there where I considered
that, you know.  And I really felt like God told me like no,
choose life, choose life over death and that you are a good man,
you will continue to be a good man, and this doesn't define you

1    as a person.

2        And so I want to -- moving forward, I hope it is shown in

3    my conduct that I have really tried to be a model citizen, keep

4    the rules.  I do want to put this behind me.  I want to have a

5    family.  I want to rebuild my life.  I want to continue being a

6    contributing, valuable member of society.

7        And I did have a moment of clarity in there.  I realized

8    that this was wrong being here, I shouldn't be here, and I need

9    to leave when I was in the Capitol.

10            THE COURT:  You did or did not?

11            THE DEFENDANT:  I did.

12            THE COURT:  You mean after you were in the seat?

13            THE DEFENDANT:  I was sitting in the Senate chair.  I

14    mistakenly thought it was the Pelosi chair.  I was like, What

15    else is there?  What else is there?  I delivered my speech that

16    I -- America will never hear, but I realized, like, this has

17    gotten way out of hand.  At that time, I was not aware of how

18    out of hand it had gotten.  But my path through it had been too

19    much, and I realized that yeah, I need to leave, I need to

20    leave, this is not good.

21        And that was also one of the reasons I was like -- I sat on

22    the curb, and kind of the gravity of everything kind of hit me.

23        And then on top of that, I started seeing all the videos.

24    I was like, dude, this turned into something way more extreme

25    and tragic than I ever wanted to be associated with.

1    And that's why I've cooperated fully with the government,

2    gave them my GoPro footage, and I honestly have had the time to

3    reflect and put myself in the position of each one of the

4    victims of the Capitol riot, and, you know, feel genuine remorse

5    for it.

6    I've always been someone who tries to do the right thing

7    and help others.  It will never happen again, and I've reflected

8    on a few lessons I've learned about that.

9    Rallies can escalate quickly.  They can go from "rah

10    rah" -- and addressing Ms. Arco's comments earlier about the

11    December interview, when I used the term "mostly peaceful

12    protest," in my mind, it was kind of like a timeline of okay,

13    from when we got there to when it happened, everything leading

14    up to Trump's speech was generally like good vibes, rah rah

15    America-type feeling.

16    So when I say "mostly," I'm taking into account the whole

17    previous day, not -- the part where everybody that went into the

18    Capitol was not peaceful at all in my opinion.

19    But I am truly sorry that everything that happened on

20    Capitol grounds that day.  I also learned I want to be

21    associated with the good things I do, the beautiful music, art,

22    service in the community, helping small businesses grow with my

23    marketing skills, and I hope that that -- I know that you will

24    give a fair sentence.  I know you have already taken into

25    account my personal history.

1        Thank you, by the way, for reading those letters.  The big

2    question was, do they even read these.

3            THE COURT:  Absolutely, every one of them, every

4    sentence.

5            THE DEFENDANT:  I hope you can see that I have an

6    incredible family and supportive people around me.  I hope my

7    positive actions show before and after.  Honestly, I want to

8    thank -- going through this process, as harrowing and scary as

9    it's been with the courts, has restored in a way a lot of my

10   faith in institutions.  Dealing with Mark and Chuck, we don't

11   see eye to eye on some things, but there's a level of humanity

12   there and respect and that we can talk about it and push back

13   and --

14           THE COURT:  You can agree to disagree.

15           THE DEFENDANT:  And open up new perspectives that I

16   hadn't seen before, and vice versa, and grow as a person.

17   Mark's really pushed hard on me, a lot of my beliefs that led me

18   up until that point.  There's been a lot of constructive

19   conversation around that.

20       I want to thank again Boise Police Department for

21   protecting my family, the Court for hearing me out today.  The

22   Pretrial people have been amazing, Shelly, and just calling in

23   every week and checking in.  They're nice.  They're respectful.

24       And even the prosecution, I understand their job --

25           THE COURT:  Even Ms. Arco?

1          THE DEFENDANT:  She's been incredibly sweet and

2     wonderful to work with, and I really appreciate her comments

3     today.

4          THE COURT:  And I assume the FBI as well?

5          THE DEFENDANT:  They were respectful, too.  And so I

6     think there's been a level of humanity maintained, which I

7     appreciate.  Obviously, varying opinions.

8          But I want to end on the fact that I -- it does make me sad

9     where we're at as a country, from a small microcosm of like Mark

10     and I conversation, that we can't -- that it's so hostile right

11     now.  And I know that this event can turn into a positive thing

12     in some way, that we realize hey, there is a level of humanity

13     here where we can agree to disagree but we can do it civilly, we

14     don't need to break the law, however big or small, to get our

15     point across, and that we can just find healing and humanity and

16     a lot of forgiveness.

17          There does need to be a lot of forgiveness that happened on

18     both sides for us to move forward as a strong country.

19          Again, Your Honor, thank you for this opportunity.

20          THE COURT:  Mr. Colt, as we discussed a little bit

21     before during the sealed hearing in the context of cooperation,

22     you do have an opportunity to be an agent for change, and you

23     can deliver that message in the way that those of us who didn't

24     participate in January 6 can't.

25          You can reach people who are in that mind-set, and you can

1    share with them your experience and your renewed faith in the

2    institutions of government and the courts and the FBI and the

3    Department of Justice and the way the court system treats people

4    and the fairness and all of those things.

5         And so I think that you're right, that this can,

6    particularly in your life, be turned into something positive,

7    that you not just learn from personally but that you can

8    actually have an impact beyond your own experience.  You can

9    help others see the light in a way that they might not be able

10    to unless someone like you helps them.

11        So I hope you will seize those opportunities which

12    inevitably you will have in front of you, whether it's while

13    you're under a sentence of this Court or even afterwards,

14    because you've lived this in a very dramatic way, and it sounds

15    like you've learned lessons through it that you can share with

16    others.  I hope that you will do that.

17        Anything else you would like to say?

18            THE DEFENDANT:  I appreciate your feedback, both out

19    of seal and under seal, and it is taken to heart.  It's not lost

20    on me.  And yeah, just thank you, America, thank you, everybody,

21    and that's the end of my remarks.

22            THE COURT:  All right.  Thank you for your remarks,

23    Mr. Colt.

24        All right.  Is there anything more from the government?

25            MS. ARCO:  No, Your Honor.

1          THE COURT:  Is there any reason why sentence cannot be

2    imposed now?

3          MR. ACKLEY:  No, Your Honor.

4          THE COURT:  I'm not going to go through the facts of

5    this offense for the second time today.  I have adopted the

6    presentence report as my findings of fact.  I feel like everyone

7    in here is familiar with the facts of the Sandlin/DeGrave/Colt

8    case.

9          Of the three, Mr. Colt did play less of a role than the

10   other two.  Still, he played a significant role in what was, as

11   Ms. Arco said, an unprecedented event, this attack on the

12   Capitol of the United States on a date that senators and

13   representatives had gathered to certify the results of the 2020

14   presidential election.

15         Mr. Colt, especially listening to you talk, even before I

16   heard you talk but especially listening to you talk, it's really

17   difficult to see how you got here today.  Your actions on

18   January 6 are, by all accounts, all the many letters that I've

19   read, and even Ms. Arco's representations about how you've

20   conducted yourself during the course of debriefings and coming

21   forward early and all of that, it's very out of character.

22         You have a long history of helping others.  You have a very

23   loving and supportive family who care a great deal about you and

24   you them, and you have a number of impressive achievements in

25   your background.

1    The Court appreciates that you do have a tendency to act

2    impulsively for sure, and while that tendency may have played

3    some role in some of the very unwise decisions you made inside

4    the Capitol on January 6, such as sitting in what you thought

5    was the speaker's seat actually in the Senate Gallery, not the

6    House, jumping down from the balcony to the floor.  Those were

7    certainly impulsive acts.

8    But there was sufficient planning ahead of time for sure

9    that you and your co-defendants engaged in that the Court simply

10   is unable to conclude that your impulsivity is the reason for

11   why you became a part of this violent riot.  And I can't

12   conclude that the reason you stand before me today is because of

13   a momentary lack in judgment.  It was a result of many poor

14   premeditated choices that bring you before the Court today.

15   To your credit, you did not assault any officers that day.

16   You also didn't do anything to stop your co-conspirators from

17   doing so.  But you did not destroy any or take any property, so

18   far as the Court is aware.

19   But you did engage in extensive planning before January 6

20   and on January 6, and I'm not going to restate all those actions

21   here.  They're set forth in the PSR.  But in short, you

22   discussed, you know, gear, weapons, engaging in violence.

23   You were not involved in the evidence destruction.

24   Correct, Ms. Arco?

25        MS. ARCO:  That's correct, Your Honor.

1          THE COURT:  What about the evasion with the FBI?

2      No, he came forward on like day 6.  So unlike your

3  co-conspirators, I credit you in those ways.

4      But there was a degree of planning.  Fortunately, you had a

5  quick change of heart, and you self-surrendered and immediately

6  showed remorse and decided to cooperate with the government.

7  You did so very early.  You were the first in the January 6

8  investigation to cooperate, and that, I know, was a very

9  difficult, courageous decision that has put you in a very, very

10 different position than your co-conspirators at the time of

11 sentencing.

12     The Court views your actions as less culpable, as I've

13 said, than your co-conspirators, who assaulted officers, and at

14 least with respect to Mr. Sandlin, he engaged in significantly

15 more planning and the like than did you and Mr. DeGrave.

16     But you stand here in a markedly different position than

17 you would have been otherwise, due to both the timing and the

18 nature of your cooperation, which was certainly substantial.

19 The government would not be making the recommendation and the

20 Court would not be considering the government's recommendation

21 and a sentence of 18 months but for your substantial truthful

22 cooperation.

23     Moving away from the nature of the offense and your

24 cooperation, you have no significant prior record.  You faced a

25 lot of trauma in your background, as I noted, both as a child

and as an adult.  I will specifically refer to paragraphs 57,
58, 59, 60, and 63.

It's apparent that you regret deeply the negative impact
that this has had not just on you -- your actions that day just
not on you but also on your family.

I think I've already made clear that I don't view Mr. Colt
as an inherently dangerous or violent individual.  Even so, the
offenses he committed are extremely serious and warrant in the
Court's view a sentence of imprisonment, even taking into
account his personal history and characteristics and
cooperation.

I do believe that the remorse you expressed today and
pretty much throughout the pendency of your case has been
genuine and heartfelt.  There was one circumstance we discussed
in December of 2022, but I do credit what you say when you want
to be a force for change and you want to turn this into
something positive.

And so I encourage you, when you are in prison, that you
find ways to make the most of this experience.  And that's not
just relating to those like yourself who were involved in the
January 6 events, but also those in prison who haven't had the
support that you've had on the outside, don't have the
educational background, don't have some of the gifts you have.

There are all kinds of ways that you can support and mentor
and help those in prison in a way that I think would be

1   meaningful for you and perhaps might help you feel -- forgive

2   yourself and feel less shame over time if you're able to put

3   your many gifts to use in prison.

4       I think that Mr. Ackley has made a good point with respect

5   to cooperation and the government's significant departure here,

6   which is a nine-level departure, which is much greater than

7   Mr. DeGrave, and that's principally because of the timing again

8   and the nature of your cooperation, which no doubt led to his

9   plea as well as others, January 6 defendants as well as

10  Mr. Sandlin's.

11      I appreciate what Ms. Arco said about the decision being a

12  fulsome one that's not just looking exclusively at cooperation.

13  However, I do think that some of the 3553(a) factors in this

14  case do warrant a slightly greater variance or departure than

15  the government has given, but not much, because I do agree that

16  the government has given you the low end at a level 15,

17  substantially below your sentence of 51 to 63 months, and that's

18  a guideline range of 18 to 24.

19      I will come down an additional level to 15 to 21, and I

20  will sentence you to 15 months in prison.  I will not impose a

21  fine.  I don't think you have the ability to pay a fine.  I will

22  impose restitution pursuant to the plea agreement of $1,000, and

23  I will read now the formal sentence of the Court and give both

24  parties an opportunity to object before I impose it.

25      Pursuant to the Sentencing Reform Act of 1984 and in

consideration of the provisions of Title 18 United States Code

Section 3553, as well as the advisory sentencing guidelines, it

is the judgment of the Court that you, Josiah Colt, are hereby

committed to the custody of the Bureau of Prisons for a term of

15 months.

As to Count 1, you're further sentenced to serve a term of

supervised release as to Count 1.  In addition, you're ordered

to pay a special assessment of $100.

While on supervision, you shall abide by the following

mandatory conditions as well as the discretionary conditions

recommended by the Probation Office in Part D of the sentencing

options of the presentence report.

And Mr. Ackley, I think you've reviewed those with Mr. Colt

already?

MR. ACKLEY:  I have, Your Honor.

THE COURT:  There's not a need to state them on the

record?

MR. ACKLEY:  That's correct, Your Honor.

THE COURT:  The mandatory conditions include not

committing another federal, state or local crime, not unlawfully

possessing a controlled substance, refraining from any unlawful

use of a controlled substance, submitting to one drug test

within 15 days of placement on supervision and at least two

periodic drug tests thereafter, cooperating in the collection of

DNA as directed by the Probation officer, making restitution in

1    the amount of $1,000 to the Architect of the Capitol.  And those

2    payments may be made to the Clerk of Court for the U.S. District

3    Court for the District of Columbia.

4         Until the financial requirements are met, you must provide

5    the Probation officer with access to any requested financial

6    information and authorize the release of any financial

7    information, and the Probation Office may share that with the

8    U.S. Attorney's Office.

9         In terms of community service, if -- let me ask Officer

10   Gavito, can I impose a condition of community service if

11   Mr. Colt is not engaged in employment?  I think priority

12   number 1 needs to be getting a job and being able to fulfill his

13   financial restitution and fine requirements.

14        Could I make that a conditional condition?

15             PROBATION OFFICER:  You may, Your Honor.  We'll

16   include it in the -- as long as it's written in that manner in

17   the judgment as a community service being a condition if the

18   defendant does not -- is not actively seeking employment or has

19   employment.

20             THE COURT:  Looking at the -- I'm going to go ahead

21   and keep it.  It's only 100 hours.  I think that's more

22   confusing.  And this, of course, can be completed over the

23   course of a full year; isn't that standard?

24        So I will impose a community service condition of 100 hours

25   to be completed within 12 months.  You will be supervised by the

probation officer, and you must provide written verification of completed hours.  Mr. Colt, I expect that to be in-person community service, not online.

Again, I find you don't have the ability to pay a fine, and therefore, I waive imposition of a fine.  The financial obligations are immediately payable to the Clerk of Court.

The Probation Office shall release the presentence report to all appropriate agencies, which include the Probation Office in the approved district of residence, which is Idaho.

In order to execute the sentence of the Court, the treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion and termination from treatment.  I neglected to mention, I do want to impose a mental health condition as well.

Mr. Colt, you can appeal your conviction to the U.S. Court of Appeals for the D.C. Circuit if you believe your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings that was not waived in your plea agreement.

In some circumstances, the defendant also has the right to appeal the sentence.  A defendant may waive that right as a part of a plea agreement, however, and you have entered into a plea agreement which waives some of your rights to appeal the sentence itself.  Such waivers are generally enforceable, but if you believe the waiver itself is not valid, you can present that

1    theory to the appellate court.

2        Pursuant to Title 28 United States Code Section 2255, you

3    also have the right to challenge the conviction entered or the

4    sentence imposed to the extent permitted by that statute in your

5    plea agreement.

6        Any notice of appeal must be filed within 14 days of the

7    entry of judgment or within 14 days of the filing of the notice

8    of appeal by the government.

9        If you're unable to afford the cost of an appeal, you may

10   request permission from the Court to file an appeal without cost

11   to you.  On appeal, you may apply for court-appointed counsel.

12       All right.  Ms. Arco, are there any objections to the

13   sentence as announced?  I won't order a re-entry hearing.

14           MS. ARCO:  No objection, Your Honor.

15           THE COURT:  Mr. Ackley?

16           MR. ACKLEY:  No objection.

17   I do have a question.  Will interest accrue on the

18   financial obligations?

19           THE COURT:  No, I will waive interest as well, given

20   his financial circumstances.

21           MR. ACKLEY:  Thank you, Your Honor.

22           THE COURT:  Is there a recommendation on location?

23           MR. ACKLEY:  Yes, Your Honor, FCI Sheridan.  That's

24   with a D, Sheridan, Oregon, S-h-e-r-i-d-a-n.

25           THE COURT:  Ms. Gavito, anything else?

1          PROBATION OFFICER:  Your Honor, is the Court allowing

2     Mr. Colt to self-surrender?

3          THE COURT:  Yes, I am.  There's no objection from the

4     government; correct?

5          MS. ARCO:  No, Your Honor.

6          PROBATION OFFICER:  And with regards to transfer of

7     supervision, I know the Court is always inclined to maintain

8     jurisdiction.

9          THE COURT:  Transfer supervision but not jurisdiction.

10    So if there are any violations of supervision -- which I don't

11    expect, but if there are, then I will handle them.

12         PROBATION OFFICER:  Thank you, Your Honor.

13         THE COURT:  Are there remaining counts, Ms. Arco?

14         MS. ARCO:  We move to dismiss the remaining counts in

15    the indictment, Your Honor.

16         THE COURT:  The Court will dismiss them without

17    objection.

18       I'm going to stay on the bench, but we are adjourned.  I've

19    got another matter.

20       (Proceedings adjourned at 3:08 p.m.)

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick_____        August 14, 2023_____

9    SIGNATURE OF COURT REPORTER          DATE